IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ALAN W. CRAVENS                                        PLAINTIFF

v.                         Civil No.: 09-cv-5187

DR. HUSKINS ET AL.                                    DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Alan W. Cravens, an inmate of the Ouachita River Unit of the Arkansas Department of Correction ("ADC") in Malvern, Arkansas, filed this civil rights action under 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Jimm Larry Hendren, Chief United States District Judge for the Western District of Arkansas, referred this case to the undersigned for the purpose of making a report and recommendation.

## I. __Background__

As this case is before the Court on Defendants' Motion for Summary Judgment, the Court will recite the facts pled by the non-moving party, the Plaintiff. Plaintiff has brought this action against the Defendants: Dr. Huskins, Sheriff Ferguson, and Captain Holly, alleging he was denied adequate medical care and denied access to the mail during his incarceration at the Benton County Detention Center ("BCDC").

On June 1, 2009, Plaintiff states he saw Dr. Huskins for a sinus infection he believed was draining into his lungs. (Doc. 1, ¶V). On this date, Plaintiff informed Dr. Huskins of his past medical history including emphysema and kidney stones. (__Id.__)

Plaintiff also informed Dr. Huskins of a current backache Plaintiff believed to be related to kidney stones. (Id.) The next day, Plaintiff received Sudafed and Robatussin. (Id.) Plaintiff was also prescribed Amoxicillin, an antibiotic. (Doc. 40, ¶17). Plaintiff did not receive anything for his backache at this time, and when the prescribed medications ran out, all of Plaintiff's symptoms came back. (Doc. 1, ¶V).

Plaintiff saw Dr. Huskins on June 5, 2009, and was noted to have an ear exam which was "negative." (Doc. 40, ¶18). As Plaintiff's chief complaint was ear irritation and the ears were clear, Plaintiff was prescribed Sudafed for his sinus problems. (Id.)

Plaintiff went back to the doctor on June 22, 2009, for the same symptoms and was prescribed antibiotics for about ten days. (Doc. 1, ¶V). Plaintiff states that while on the medication it helped his medical problems, but after the medication stopped the symptoms continued, sometimes draining into his lungs to the point he could not breathe properly. (Id.)

Between June 22, 2009 and July 7, 2009, Plaintiff went back to the doctor with the exact same symptoms plus clogged ears and impaired breathing. (Id.) At this time, Plaintiff also informed the doctor of his backache and past history of surgery for kidney stones, as well as blood currently present in his urine. (Id.) Plaintiff was placed on antibiotics and Tylenol. (Id.) On June 24, 2009, Plaintiff was examined for cold and respiratory symptoms,

colored drainage, and a cough and was placed on Bactrim, an antibiotic, as well as Sudafed. (Doc. 40, ¶20).

On July 6, 2009, Plaintiff complained he had kidney stones. (Id., ¶21). On July 8, 2009, Plaintiff went back to the doctor and was given Tylenol, Cipro (an antibiotic), and cough medication. (Id.) Plaintiff still had back pain, blood in his urine, and trouble breathing and clearing his lungs. (Doc. 1, ¶V). Dr. Huskins reports he looked at Plaintiff's back to see where he was hurting, and Plaintiff reports the leg lift pain was "beyond belief." (Doc. 40, ¶22).

On July 28, 2009, Plaintiff was complaining of back pain and of "peeing blood," thus Nurse Smith, a non-party to this case, instructed the sergeant to give Plaintiff Tylenol and an extra cup of water. (Id., ¶23). Plaintiff was also placed on bed rest and was to receive Bactrim, an antibiotic. (Id.)

The next day, July 29, 2009, Plaintiff was examined for right flank pain. (Id., ¶24). Dr. Huskins stated a urine test was done, which was negative with no blood or bacteria in the urine. (Id.) However, Plaintiff contends he would be forced to wait and drink "lots of water" over a period of three or more days until his "urine cleared up then [they would] check me." (Doc. 40, ¶24).

Dr. Huskins reported on July 31, 2009, that Plaintiff had improved with "no back pain" and his exam was negative, so he was kept on Tylenol. However, Plaintiff contends he "had to beg for Tylenol." (Id., ¶25).

-3-

Plaintiff complained on August 1, 2009, that he still had back pain, and was to see the doctor. (Id.)  Plaintiff contends he had to wait 2-3 days to see the doctor, "until [he] stopped bleeding." (Id., ¶26).

Dr. Huskins examined Plaintiff on August 3, 2009, for right flank pain which was intermittent. (Doc. 40, ¶27).  The urine test showed a trace of protein, but no blood, leaving Dr. Huskins to believe there could be some infection. (Id.) Dr. Huskins then placed Plaintiff on Cipro, an antibiotic, and Tylenol. (Id.) However, Dr. Huskins did not believe there were kidney stones because the exam was negative for blood in the urine. (Id.)

On August 7, 2009, Plaintiff sent in a grievance requesting a second opinion on the kidney stones due to his continued pain, and requesting to go to the hospital. (Id., ¶28.)  Plaintiff was told the doctor makes the medical decisions at the BCDC. (Doc. 40, ¶28).

Plaintiff placed another request to see the doctor on August 15, 2009, and was continued on Tylenol, to be given one to four times a day, for another six to seven days. (Doc. 1).  Plaintiff was in pain, to the extent he had trouble ambulating. (Id.)

On August 19, 2009, Dr. Huskins examined Plaintiff for back pain and a rash on Plaintiff's foot. (Doc. 40, ¶30).  The urine test was clear, and Plaintiff was treated with fungus cream and Tylenol. (Id.)

On August 25, 2009, Plaintiff stated the Tylenol was not

helping and he had a kidney stone.  (Doc. 40, ¶31).  Plaintiff also stated he could not tolerate the pain anymore and Nurse Smith responded she would "order a different med."  (Id.)  On or around August 26, 2009, Plaintiff was given Aspirin which did not help his pain "at all."  (Id., ¶32).

On August 28, 2009, Plaintiff complained that he had been to Court on July 6, 2009, and the judge had ordered medical attention for his kidney stones.  (Id., ¶34).  Captain Holly replied that the doctor made the medical decisions in the jail.  (Id.)  On that same date, Plaintiff complained that he had placed requests to see the doctor, with no reply, and a request to use his emergency breather was refused.  (Doc. 40, ¶35).  Captain Holly responded that the doctor was not in on August 28 and Plaintiff should put in a medical request if he wanted to see the doctor or nurse.  (Id.)

On August 30, 2009, Plaintiff requested medical care, complaining he was out of his night-time medication for two days.  (Id., ¶36).  Plaintiff was to see the doctor.  (Id.)

On September 2, 2009, Plaintiff complained he was out of his night blister-pack of medication.  (Id., ¶37).  The nurse noted she would check into it.  (Doc. 40, ¶37).  Dr. Huskins also examined Plaintiff on September 2, 2009, observing Plaintiff to have back pain, with an intact range of motion, and that Plaintiff's urine test was clear for the presence of blood.  (Id.)  The urinalysis results obtained on September 2, 2009, did show a trace of protein.  (Id., ¶39).  Plaintiff's blood pressure was elevated to 140/90,

-5-

which Dr.  Huskins described as "something to watch," and the fungus cream for Plaintiff's foot and his Tylenol were refilled. (Id.)

On September 8, 2009, Plaintiff complained of kidney problems and stated he could no longer tolerate the pain he was experiencing.  (Id., ¶40).  Dr.  Huskins examined him on September 11, 2009, and stated that Plaintiff's complaints were of back pain, hernaturia, and a foot rash.  (Doc.  40, ¶41).  Plaintiff's urine was again checked, and was clear.  (Id.)

On September 12, 2008, Plaintiff complained he had received nothing for his kidney pain or foot rash.  (Id., ¶42).  The nurse responded that Plaintiff's urinalysis was negative and he was to see the doctor.  (Id.)

On September 14, 2009, Plaintiff requested medical care, stating he still had kidney pain and pain in his lower back.  (Id., ¶43).  On September 16, 2009, he was seen for back pain and was given Tylenol.  (Doc.  40, ¶44).  However, on September 22, 2009, Plaintiff complained his back pain was still present and the Tylenol was not helping or making the pain go away.  (Id., ¶45).

On September 24, 2009, Plaintiff complained that mail from his wife was being sent back to her.  (Id., ¶107).  Lt.  Carter responded to the grievance and stated that "if the incoming mail does get sent back to sender if not within the guidelines of page 20 of the inmate handbook."  (Id.)  Plaintiff contends "others were mailed to them labeled same as mine."  (Id.)

Dr. Huskins saw Plaintiff on September 25, 2009, for back pain and sinus problems. (Doc. 40, ¶46). He was prescribed Sudafed and Tylenol. (Id.) Plaintiff requested medical care again on September 30, 2009, stating he had been in the BCDC for over five months and could only obtain Ibuprofen or Tylenol for his complaints of pain. (Id., ¶47). Plaintiff also stated that he was continuing to have sinus problems, including drainage into his lungs. (Id.)

On October 2, 2009, Dr. Huskins saw Plaintiff for his complaints of cold symptoms and back pain. (Id., ¶48). The urinalysis was clear and the exam negative. (Doc. 40, ¶48). Plaintiff was prescribed Cipro, an antibiotic, and Aleve. (Id.)

On October 6, 2009, Plaintiff again requested medical care for breathing problems. (Id., ¶49). Dr. Huskins saw Plaintiff the next day on October 7, 2009, and continued Cipro and Sudafed. (Id., ¶50). Dr. Huskins noted Plaintiff's exam was negative. (Id.)

Plaintiff complained of kidney pain and sinus blockage on October 12, 2009. (Doc. 40, ¶51). On October 14, 2009, Dr. Huskins examined Plaintiff for cold symptoms and for back pain. (Id., ¶52). Dr. Huskins stated that Plaintiff was having back pain down his leg and also had head and chest cold symptoms and was thus treated with Tylenol and Sudafed. (Id.)

Plaintiff complained on October 20, 2009, that he had sent out legal mail and that mail never reached its destination. (Id.,

¶108).   Jail  personnel  responded  that  Plaintiff  only  had  one
incoming  letter  for  the  month.   (Id.)

On  October  22,  2009,  Plaintiff  stated  he  had  gone  to  Dr.
Huskins  for  six  months  with  complaints  of  kidney  pain  and  bleeding.
(Doc.  40,  ¶53).   Plaintiff  requested  something  to  help  him  walk
upright  and  not  hurt,  and  was  to  see  the  doctor.   (Id.)   Dr.
Huskins  saw  the  Plaintiff  the  next  day,  on  October  23,  2009,  for
back  pain  and  noted  Plaintiff's  range-of-motion  was  "ok."   (Id.,
¶54).   However,  Plaintiff  states  he  could  not  stand  up  straight.
(Id.)   Plaintiff  was  prescribed  Tylenol.   (Id.)

On  October  29,  2009,  Plaintiff  requested  medical  care  for
sinus  problems  and  a  sore  throat.   (Doc.  40,  ¶55).   The  nurse
treated  Plaintiff  on  October  30,  2009,  by  giving  him  Sudafed  and
Tussin.   (Id.,  ¶56).   That  same  day,  Plaintiff  complained  of  back
pain,  periodic  blood  in  his  urine,  and  foot  problems.   (Id.,  ¶57).

Plaintiff  saw  Dr.  Huskins  on  November  2,  2009,  and  was  given
Tylenol  and  fungal  cream.   (Id.,  ¶58).   Dr.  Huskins  noted  the  back
exam  to  be  "negative"  and  so  he  continued  Tylenol.   (Id.)

On  November  15,  2009,  Plaintiff  complained  of  sinus  drainage
and  saw  Dr.  Huskins  on  November  16,  2009.   (Doc.  40,  ¶¶60,  61).
Plaintiff  had  fungus  on  his  feet  and  respiratory  symptoms,  so  he
was  treated  with  Tylenol,  fungus  cream,  and  Sudafed.   (Id.,  ¶61).
On  the  next  day,  November  17,  2009,  Plaintiff  stated  he  was  in  a
lot  of  pain  and  would  like  two  Tylenol,  three  times  a  day.   (Id.,
¶63).   The  nurse  ordered  the  increase  in  medication  for  a  "short

-8-

time only."   (Id.)

Plaintiff requested medical care for a sinus infection which had drained into his lungs on November 21, 2009.  (Id., ¶64).  On that date, the nurse noted Plaintiff wanted Tussin and Sudafed and that those medications were ordered until Plaintiff was seen by Dr. Huskins on the next Monday.  (Doc. 40, ¶65).  Dr.  Huskins saw Plaintiff on November 23, 2009, for respiratory symptoms and prescribed Sudafed, Tylenol, and Amoxicillin.  (Id., ¶66).

On December 3, 2009, Plaintiff complained of back pain and requested more than two Tylenol per day.  (Id., ¶68).  Nurse Hartgraves responded that Plaintiff was on the doctor list, and that she would increase two Tylenol in the meantime.  (Id.)  On that same date, Nurse Hartgraves noted in Plaintiff's medical record that she was informed by Deputy Oaks that Plaintiff was refusing two medications and after speaking with Plaintiff he stated the medications did not work and "messed with his kidneys." (Id., ¶69).  Plaintiff agreed to take his medication until he saw Dr.  Huskins the next Monday, December 7, 2009.  (Doc.  40, ¶69).

On December 7, 2009, Dr.  Huskins examined Plaintiff and noted Plaintiff had neck pain as well as difficulty swallowing.  (Id., ¶73).  Dr.  Huskins noted that Plaintiff had been refusing to take his medication, but Plaintiff agreed to take his medication and the Tylenol for Plaintiff's back was refilled.  (Id.)

On December 8, 2009, Plaintiff requested medical care stating that his "night meds" had run out on December 6, 2009, and that his

-9-

Combivent had run out on December 7, 2009. (<u>Id.</u>, ¶74). Plaintiff also requested his inhaler because he "can't breathe" and noted he did not sleep "without night meds." (<u>Id.</u>) The nurse responded that Plaintiff's inhaler had been given to him on that same date and requested more information regarding his night medication. (Doc. 40, ¶74).

On December 9, 2009, Dr. Huskins noted that he ordered Vistaril for Plaintiff, which is an antihistamine tranquilizer-type medication, however, Plaintiff disagrees noting "Tylenol, Asprin, Sudafed, Tussin, and Antibiotics only." (<u>Id.</u>, ¶76). The next day, December 10, 2009, Plaintiff requested medical care, stating his night-time medication had run out and the nurse responded the medication was in the pod. (<u>Id.</u>, ¶77).

On December 13, 2009, Plaintiff complained that he had been in the BCDC over seven months and had been bleeding and having severe back pain with a history of kidney stones. (<u>Id.</u>, 78). Plaintiff stated that on August 6, 2009, Judge Green ordered him to get help and he still had not received help. (<u>Id.</u>) Additionally, Plaintiff requested his medical records be faxed to the ADC, so that when he arrived there he could receive help. (Doc. 40, ¶78). The nurse responded there were no orders from Judge Green, and that the ADC could ask for records once he was transferred. (<u>Id.</u>)

On December 15, 2009, Plaintiff asked to see the doctor for more pain medication. (<u>Id.</u>, ¶79). Additionally, Plaintiff stated that an Order from Judge Green would be on the August 6 court

-10-

transcripts of his case and that he needed help.   (Id.)   Dr. Huskins treated Plaintiff on December 18, 2009, noting Plaintiff's range of motion was intact and that he treated Plaintiff with Tylenol.   (Id., ¶80).

On December 25, 2009, Plaintiff complained he woke up with blood in his urine, could hardly walk, and was to see the doctor. (Doc. 40, ¶81).  On December 28, 2009, Plaintiff complained that he was bleeding when urinating and needed to see the doctor.  (Id., ¶82).  The nurse noted on that same date that Plaintiff refused valporic acid, one of his medications.  (Id., ¶83).

Dr. Huskins examined Plaintiff on December 28, 2009, for back pain, noting the range of motion was intact and leg raises were negative.  (Id.,  ¶84).  Dr.  Huskins continued Tylenol.  (Id.) Plaintiff states his examinations with Dr.  Huskins were never longer than two minutes, he was only given leg raises once, and that if x-rays had been performed it would have shown his kidney problem, despite the repeatedly negative uranalysis.  (Doc.  40, ¶85).

On December 30, 2009, Dr.  Huskins examined Plaintiff again, and increased Tylenol.  (Id., ¶85).  On January 10, 2010, Plaintiff complained he was out of pain medication, and the nurse continued his Tylenol.  (Id., ¶86).  Plaintiff was seen by the nurse on January 13, 2010, and the Tylenol was continued.  (Id., ¶88).

On January 31, 2010, Plaintiff complained of sinus discharge. (Id., ¶93).  Dr.  Huskins examined Plaintiff on February 1, 2010,

-11-

for back pain and head and chest cold symptoms.  (Doc.  40, ¶94).
Dr.  Huskins prescribed cough medication, Tylenol and "fungus
medicine for the feet."  (Id.)

On February 2, 2010, Plaintiff complained that his sinuses
were clogged and that he needed Sudafed, but had received
Robatussin.  (Id., ¶95).  The nurse responded he had just seen the
doctor the previous day.  (Id.)

On February 22, 2010, Plaintiff again complained that his
sinuses were draining into his lungs.  (Id., ¶96). He requested
Sudafed and Tussin, and the medication was ordered by the nurse.
(Doc.  40, ¶96).

On February 28, 2010, Plaintiff complained of clogged sinuses
and was to see the doctor.  (Id., ¶97).  Plaintiff saw the doctor
on March 1, 2010, for respiratory problems and was prescribed
Tylenol and Sudafed.  (Id., ¶98).

Dr.  Huskins stated that Plaintiff had a subjective belief
regarding kidney stones, and that prompted Dr.  Huskins to do the
continual urinalysis to show if there was a problem.  (Id., ¶99).
Dr. Huskins stated there could be some problems that a urinalysis
would not show, but "repeatedly you think you'd find something if
it's there."  (Id.)  However, Plaintiff indicates the time between
his actual bleeding and being seen caused the urinalysis to be
negative.  (Doc.  40, ¶99).  Moreover, Plaintiff states Dr.
Huskins only did the bare minimum and did not perform an x-ray or
"use all avenues" to determine the cause of Plaintiff's back pain,

as he should have.  (Id.)

Regarding his denial of access to mail claim, Plaintiff stated that his wife was "not allowed to receive or write" during a crucial time of trial preparation.  (Id., ¶110).  Plaintiff did not know on what date the letters he attempted to send out were mailed. (Id.)  Plaintiff states he was harmed because he could not inform his wife about his needs or requests for outside help.  (Id.)

## II.  **Applicable Law**

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56 (a).  The court views the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  See Adkison v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The moving party has the burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. **Discussion**

### A.  **Official Capacity Claims**

Under Section 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the

-13-

Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the <u>Gorman</u> case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. <u>Id.</u> at 24-27. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. <u>Id.</u> at 25-27.

<u>Gorman</u>, 152 F.3d at 914.

A review of the Complaint (Doc. 1) in this case shows that Plaintiff has failed to specifically plead whether the named defendants were being sued in their official or individual capacities.  In response to the Motion for Summary Judgment, Plaintiff stated he was suing Defendants in their official capacities only.  (Doc. 40, ¶112).  However, understanding the distinction between official capacity and individual capacity claims is at times difficult for even those with legal training to make.  <u>See e.g.</u>, <u>Vanhorn v. Oelschlager</u>, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the differences between official and individual capacity claims and the immunities available).

Given the duty of the Court to liberally construe *pro se*

-14-

pleadings, including the duty to address the substance of the allegations rather than the form of the titles given them by *pro se* plaintiffs, <u>White v. Wyrick</u>, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"); the Defendants' assertion in their Answer (Doc. 17), that they are entitled to qualified immunity[1], a defense only available to Defendants sued in their individual capacities, <u>Parrish v. Ball</u>, 594 F.3d 993, 1001 (8th Cir. 2010); the Defendants' Motion for Summary Judgment, which addresses the Complaint as making both individual and official capacity claims; and the fact that it does not appear Defendants will be unfairly prejudiced in anyway, I will construe the complaint as asserting both individual and official capacity claims against the Defendants.

Plaintiff's official capacity claims are tantamount to suing Benton County. Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978). Because <u>Monell</u> specifically rejected liability based solely on

---

[1]  Defendants do not raise a qualified immunity argument in their Motion for Summary Judgment and, therefore, the Court does not address qualified immunity in this Report and Recommendation.

respondeat superior, <u>id.</u> at 691, "[a] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." <u>White v. Holmes</u>, 21 F.3d 277, 280 (8th Cir. 1994). Rather, official-capacity liability must be based on deliberate indifference or tacit authorization. <u>Id.</u> Policy or custom official-capacity liability is imposed by 42 U.S.C. § 1983 only for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." <u>Monell</u>, 436 U.S. at 690-91.

Plaintiff in this case has neither made any allegations that there were unconstitutional policies or practices in Benton County, nor has he provided any evidence of the same. In fact, in response to the Motion for Summary Judgment, when asked as to the custom or policy at issue, Plaintiff left the response blank. (Doc. 40, ¶112). As such, Defendants' Motion for Summary Judgment (Doc. 33) should be **GRANTED** as to all claims made by Plaintiff against Defendants in their official capacities.

**B.  <u>Individual Capacity Claims</u>**

Plaintiff has made two individual capacity claims: that he was denied adequate medical care, and that Defendants' interfered with his mail. I will address each claim in turn.

**i.  <u>Denial of Adequate Medical Care</u>**

The Eighth Circuit analyzes both a pretrial detainee's and a

convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F .3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, although he was seen numerous times by Dr. Huskins, Plaintiff maintains there was no determination of whether kidney stones were present, other than continued urinalysis. Dr. Huskins agreed that kidney stones could be present but not detected by the urinalysis, yet no further testing was done despite

Plaintiff's continued complaints of increased back pain and trace amounts of protein detected by the urinalysis.  Plaintiff asserts that the Order of the state court judge that he be given medical treatment was ignored.  Additionally, he states the only medication he was ever given for the pain in his back was Tylenol, Asprin, or Aleve, all which were insufficient to manage his pain.

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and citation omitted).  An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id.  Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

In this case, while Plaintiff was seen numerous times and prescribed medication, on a number of occasions, he advised the medical staff that the medication was not working, he was in pain, and could not walk or stand up straight. Despite this, Dr. Huskins' notes indicate Plaintiff reported being much improved, and that leg raises and other back exams were "negative."  Clearly, the records

-18-

are contradictory as to whether the medication was providing Plaintiff any measure of relief.

As noted above, Plaintiff submitted repeated requests stating that the medication provided to him was inadequate in providing pain relief. Nothing in the record suggests medical personnel considered Plaintiff's complaints of pain to be exaggerated or not supported by his medical condition.

Therefore, I believe there are genuine issues of fact as to whether Dr. Huskins exhibited deliberate indifference to Plaintiff's serious medical needs. With respect to Sheriff Ferguson and Captain Holly, although supervisors cannot be held liable on a theory of respondeat superior, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." Langford v. Norris, No. 09-1862, 2010 WL 2813551,* 10 (8th Cir. July 20, 2010) (citation omitted). Captain Holly appears to have responded to some of Plaintiff's requests and grievances which stated Plaintiff was not receiving adequate medical care and therefore had actual knowledge of Plaintiff's serious medical needs and of his complaints of inadequate pain management. (See Doc. 35-5).

Regarding Defendants Huskins and Holly, there are genuine issues of fact as to whether the care received by Plaintiff was so deficient that it violated the Eighth Amendment. Therefore, it is my recommendation that Summary Judgment be denied on those claims. As Plaintiff has made no allegation regarding actual knowledge,

action, or inaction by Sheriff Ferguson, I find no issues of fact and recommend that Plaintiff's denial of medical care claims as to Sheriff Ferguson be dismissed and Summary Judgment granted.

### ii. <u>Interference with Mail</u>

Plaintiff has alleged that in September of 2009 mail sent to him from his wife was being returned to her.  Plaintiff filed a grievance on this matter, and was told by Lt. Carter, a non-party to this case, that mail must follow the guidelines set forth in page 20 of the inmate handbook.  Plaintiff maintains that other inmates had incoming mail "labeled same as mine" and their mail was delivered, while his was returned.

On October 20, 2009, Plaintiff alleged he sent out legal mail, which never arrived to its destination.  Plaintiff states that his wife was not allowed to either receive mail or write to him during a critical stage of his trial preparation and therefore he could not communicate with his wife about his needs or requests for outside help.  Plaintiff does not otherwise identify his legal mail at issue.

Privileged prisoner mail is mail to or from an inmate's attorney and identified as such.  <u>Jensen v. Klecker</u>, 648 F.2d 1179, 1182 (8th Cir. 1981).  Regarding personal mail there is no Section 1983 liability for brief, sporadic, non content-based mail delays.  <u>Roberts v. Hobbs</u>, 2007 WL 896257 (E.D. Ark. 2007).  While an inmate has protected First Amendment interests in both

sending and receiving mail, an isolated delay or other non-content based disruption in the delivery of mail will not support a Section 1983 claim.  See Thornburgh v. Abbott, 490 U.S. 401 (1989).

In this matter, Plaintiff has not alleged the disruption in his personal mail was content-based.  Moreover, Plaintiff has not alleged that any legal mail was delayed or misdirected causing him prejudice.   Gardner v. Howard, 109 F.3d 427 (8th Cir. 1997)(holding a delay of legal mail, with out evidence of improper motive or resulting interference with right to counsel or access to the Courts does not give rise to a constitutional claim).  Finally, Plaintiff has made no allegations of, and the record before the Court does not show any personal knowledge or involvement of, any named Defendant regarding Plaintiff's alleged interference with his mail.  Triplett v. Azordegan, 570 F.2d 819, 823 (8th Cir. 1978) ("A defendant will not be held liable under 42 U.S.C. § 1983 unless he was personally involved in causing the deprivation of a constitutional right or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional rights").  Therefore, I recommend that Defendants' Motion for Summary Judgment be granted as to Plaintiff's interference with mail claims.

**IV.  Conclusion**

Accordingly, it is the Report and Recommendation of the undersigned that the Motion for Summary Judgment (Doc.  33) be

**GRANTED in part and DENIED in part.** Specifically, I recommend the motion be **granted** as to:

- official capacity claims against all Defendants;
- individual capacity claims against Defendant Sheriff Ferguson for denial of medical care; and
- individual capacity claims against all Defendants for interference with Plaintiff's mail.

I recommend the motion be **denied** as to:

- individual capacity claims against Defendants Dr. Huskins and Captain Holly for denial of medical care.

This recommendation would dismiss all claims against Defendant Sheriff Ferguson, and it is therefore further recommended that Defendant Ferguson be dismissed as a defendant to this matter.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636 (b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

**DATED** this **22nd day of July 2011.**

/s/ *Erin L. Setser*
HON.  ERIN L.  SETSER
U.S.  MAGISTRATE JUDGE